OPINION
Plaintiffs-appellants, Nina D. Watson, Executrix of the Estate of Kelly R. Watson, Jr., et al., appeal from a decision of the Clermont County Court of Common Pleas granting summary judgment in favor of defendants-appellees, The Midwestern Indemnity Company, et al., in a wrongful death action.
On March 2, 1995, at approximately 8:00 p.m., Kelley R. Watson, Jr. was struck and killed on Clermontville-Laurel Road by a vehicle driven by Jessica Palm.[1] It was a clear evening and the roadway was dry. The record indicates that just prior to the accident, Watson was travelling eastbound on Clermontville-Laurel Road in a Ford Econoline van. A westbound vehicle sideswiped Watson's van, striking his driver's side rearview mirror, but did not stop. Watson stopped his van in his lane of travel on the roadway with the headlights on and the motor running. Watson did not activate his hazard lights or his turn signals.
Shannon Reese, also travelling eastbound on ClermontvilleLaurel Road that evening, came upon the Watson vehicle, which was stationary in the roadway. Reese positioned her vehicle within a car's length away from the Watson van and near the center line, intending to pass the Watson vehicle. Reese maintained her position, however, when she noticed two oncoming vehicles in the westbound lane of travel. After the first car passed the Watson vehicle, Watson exited his van and began walking toward the Reese vehicle with his back to the second westbound car. As Watson reached the driver's side rearview mirror of the Reese vehicle, he was struck by the second westbound car, which was driven by Palm. Watson died as a result of injuries sustained in the accident.
On February 7, 1996, appellants filed a complaint against appellees alleging that Watson's death was the result of Palm's negligent operation of her vehicle. Discovery began and depositions were taken. Both Palm and Midwestern subsequently filed motions for summary judgment. Appellants responded. The trial court entered a decision on April 2, 1997 in which it found that reasonable minds could only come to the conclusion that Palm did not violate R.C. 4511.21, the assured clear distance statute, because "Watson was not a reasonably discernible object as he walked on the roadway." Accordingly, the trial court granted summary judgment in favor of both Palm and Midwestern. A judgment entry was filed on June 3, 1997. It is from this judgment that appellants now appeal, raising the following assignment of error for review:
 THE TRIAL COURT ERRED AS A MATTER OF LAW BY GRANTING SUMMARY JUDGMENT TO DEFENDANTS-APPELLEES WHERE EVIDENCE SHOWED THAT ISSUE WHETHER DECEDENT (PLAINTIFF-APPELLANT) WAS A DISCERNIBLE OBJECT FOR PURPOSE OF R.C. 4511.21, ASSURED-CLEAR DISTANCE STATUTE, WAS QUESTION OF FACT FOR THE JURY.
In their sole assignment of error, appellants contend that the trial court erred by granting summary judgment in favor of appellees because genuine issues of material fact remain to be litigated. Appellants argue that because Palm was blinded by the headlights of Watson's stationary van, it is a question of fact for the jury to determine whether Watson, who was walking in Palm's lane of travel behind the headlights of the van, was a discernible object in terms of the assured clear distance statute. Thus, appellants contend that the trial court erred in its determination that Watson was not a discernible object and improperly granted summary judgment in favor of appellees.
Summary judgment is appropriate where (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds construing the evidence in favor of the nonmoving party could reach but one conclusion which is adverse to the nonmoving party. Bostic v. Connor (1988), 37 Ohio St.3d 144, 146; Civ.R. 56(C). In response to a properly supported motion for summary judgment, the nonmoving party must set forth specific facts which demonstrate that there is a genuine issue of material fact for trial in order to avoid summary judgment. Dresher v. Burt (1996), 75 Ohio St.3d 280,293; Civ.R. 56(E). When reviewing an entry of summary judgment, an appellate court applies the same standard used by the trial court and must examine all evidence properly presented to determine whether there is a genuine issue as to any material fact and whether reasonable minds can reach only one conclusion which is adverse to the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 360; Parenti v. Goodyear Tire Rubber Co. (1990), 66 Ohio App.3d 826, 829.
R.C. 4511.21(A), Ohio's assured clear distance statute, provides in pertinent part as follows:
 no person shall drive any motor vehicle * * * at a greater speed than will permit the person to bring it to a stop within the assured clear distance ahead.
A violation of the assured clear distance statute constitutes negligence per se. See, e.g., Ziegler v. Wendel Poultry Services, Inc. (1993), 67 Ohio St.3d 10, 12; Junge v. Brothers (1985),16 Ohio St.3d 1, 3. However, a motorist does not necessarily violate the assured clear distance statute just because a collision occurs. Blair v. Goff-Kirby Co. (1976), 49 Ohio St.2d 5, 7. A motorist violates the assured clear distance statute and is negligent per se where the motorist collides with an object that (1) was ahead of the motorist in the motorist's path of travel, (2) was stationary or moving in the same direction as the motorist, (3) did not suddenly appear in the motorist's path, and (4) was reasonably discernible. Blair at 7, citing McFadden v. Elmer C. Breuer Transp. Co. (1952), 156 Ohio St. 430, 434.
The assured clear distance statute imposes upon the operator of a motor vehicle an obligation to be able to stop his or her vehicle within the distance that discernible objects may be seen so as to avoid a collision. Smiley v. Arrow Spring Bed Co. (1941), 138 Ohio St. 81, 88-89. However, a motorist does not violate the assured clear distance statute where the "assured clear distance ahead is, without his fault, suddenly cut down or lessened" by an obstruction which enters his path of travel and "renders him unable, in the exercise of ordinary care, to avoid colliding" with the obstruction. Erdman v. Mestrovich (1951),155 Ohio St. 85, 92. The "assured clear distance ahead" is defined as "the distance or space between the motor vehicle of the motorist and any discernible obstruction or any limit of vision ahead of him on the highway." Smiley at 84. Thus, if a driver's view is limited by darkness, "the distance between him and the point where his vision ends or is cut off is the assured clear distance ahead." Id.
Cases involving the assured clear distance statute "require evaluation of the conduct of the driver in light of the facts surrounding the collision." Ziegler, 67 Ohio St.3d at 12-13, quoting Blair, 49 Ohio St.2d at 9. The blinding lights of an oncoming vehicle do not provide an excuse for a driver's failure to control his or her vehicle so as to prevent it from colliding with an obstruction in front of the vehicle. Smiley,138 Ohio St. at 92. Consequently, a driver that is blinded by the lights of an oncoming vehicle has a "duty to immediately decrease his speed and, if necessary, to stop until he recovered his vision." Kormos v. Cleveland Retail Credit Men's Co. (1936), 131 Ohio St. 471,477.
In the case at bar, the parties do not dispute the first three factors set forth in Blair, i.e., that Watson was ahead of Palm in her lane of travel, Watson was moving in the same direction as Palm, and Watson did not suddenly appear in Palm's path. See Blair, 49 Ohio St.2d at 7. The only dispute presented in this appeal is whether Watson was "reasonably discernible." Where conflicting evidence is presented concerning whether a particular object is reasonably discernible in terms of the assured clear distance statute, then the question is usually one of fact for a jury to decide. Sharp v. Norfolk Western Ry. Co. (1988),26 Ohio St.3d 172, 175. Thus, where conflicting evidence is presented and reasonable minds could reach different conclusions regarding whether an object was reasonably discernible, summary judgment is not appropriate. Tomlinson v. Cincinnati (1983),4 Ohio St.3d 66, 69.
In a deposition, Jessica Palm testified that on March 2, 1995, she was driving her vehicle on Clermontville-Laurel Road. Palm testified that as she was driving, she noticed two sets of headlights facing toward her, one in front of the other, on the opposite side of the road. Palm stated that she could not tell whether the cars were stopped or preparing to turn because neither car had its turn signals activated. Palm stated that she slowed down and "wasn't going that fast" because she didn't know whether the cars were going to turn. Palm stated that after she slowed down and realized that the cars weren't turning, she continued to drive westward and accelerated again. Palm also testified as follows:
 Q. As you approached the vehicle, the first set of headlights, were you blinded by those headlights? Could you see past them?
 A. I could see, because I could see the other car.
Q. Could you see anything else besides that?
 A. No. Not that I remember. Like, could I see [Watson] standing there?
Q. Uh-huh.
A. No.
* * *
 Q. Now, at the point just before you reached that first car and its headlights, were you blinded down your lane of travel by the headlights of the first car?
A. I don't think I was.
 Q. Could you see down that lane of travel in front of you, directly in front of you, your lane of travel?
A. No.
Q. Why not?
 A. Because, if I could, I don't think I would have hit [Watson].
* * *
 Q. Why couldn't you see down your lane? Because the headlights of this vehicle, or your headlights weren't on, or —
A. My headlights was [sic] on.
Q. Okay.
 A. I would have — I guess it was from their headlights.
Palm indicated that she was a little past Watson's van when her vehicle struck Watson. Palm testified that she remembers seeing Watson hit her car at the last second and that he was struck in her lane of travel. In a written statement given to police officers at the accident scene, Palm stated that she was travelling at approximately thirty-five miles per hour when her vehicle hit Watson and that she "was not flying, going fifty miles per hour or anything like that."
Jack Hafner, a passenger in the Palm vehicle, testified that he was riding in the back seat behind the passenger seat of the vehicle. Hafner stated that he saw two sets of headlights ahead on the opposite side of the road and that it looked like the van was in the front of the other car behind it. Hafner stated that:
 We was [sic] driving down the road about forty-five or so and there was [sic] head lights in the road. Traffic was stopped. So [Palm] slowed down, and I noticed the car going slower, and just heard a thump and that's how it happened, pretty much. I didn't see nothing [sic] on the road and I don't think [Palm] did either.
Hafner further testified:
 Q. When you say you saw two vehicles up ahead, could you tell — could you actually see two vehicles when you first saw the head lights up there?
A. No, the lights blinded me, really.
Q. The head lights were blinding?
A. Right.
* * *
 Q. As you approached the van, was the point where she slowed down, were the lights blinding to you from the van?
A. Right.
 Q. Did they continue to be blinding to you until you got up past the van?
A. Yeah.
* * *
 Q. When you say that the head lights were blinding on the van, do you mean you couldn't see past them to what was behind the van?
A. Right.
Q. Nor on the roadway in front of the van?
A. No.
Q. I mean, behind the van in front of Jessica?
 A. We couldn't see nothing [sic]. It was so bright it hurt my eyes.
According to Hafner, Palm was driving approximately thirty-five miles per hour immediately before striking Watson.
Dale Anderson, a passenger in the Palm vehicle, was riding in the passenger seat when the accident occurred. Anderson stated that: "We was [sic] going down through there and [Palm] slowed down. I remember [Palm] saying, `What the heck are these guys doing', or something like that, and then we couldn't see nothing [sic] until we got right next to the van and [Watson] was right there." Anderson testified that he could not see past the head lights of the van because he was blinded by them. Anderson stated that he realized there was a person in the road in front of Palm's car in the same lane of travel after they had passed the van and were approximately one or two feet away from Watson. In a written statement given to police officers at the scene, Anderson stated that the Palm vehicle was travelling at approximately thirty miles per hour when it struck Watson and that "we couldn't see [Watson] because there [sic] lights was [sic] on."
Shannon Reese, the driver of the vehicle behind Watson's van, testified that she was travelling eastbound on Clermontville-Laurel Road when she approached Watson's van which was stopped in the roadway in her lane of travel. Reese stated that she stopped approximately one car length behind the van, because she was going to drive around it, but she had to wait for two cars coming from the opposite direction to pass. Reese stated that the van did not have its turn signal or flashers activated. Reese stated that when she brought her vehicle to a stop, she was close to the center line, just enough to see oncoming traffic to the left of the van.
Reese stated that after the first car passed the van, Watson got out of the van and started walking toward her vehicle with his back to oncoming traffic. Reese stated that Watson reached the side rearview mirror of her vehicle and she rolled her window down. Reese stated that as Watson began to speak, the second approaching car struck him. Reese stated that in her opinion, the car that struck Watson was going at least fifty-five miles per hour and never slowed down. Reese stated that she could see Watson approaching her vehicle and she could see the oncoming car approaching as well.
Ohio State Highway Patrol Officer Joe Luebbers testified that he participated in the investigation of the accident that occurred on March 2, 1995 on Clermontville-Laurel Road. Luebbers testified that approximately two weeks after the accident, he and other officers participated in a re-enactment of the accident. Luebbers indicated that Watson's van and Reese's vehicle were both utilized in the re-creation. The participants in the re-enactment included Sergeant Starderman, who drove the car representing the Palm vehicle,[2] Trooper Herron who stood in the roadway and imitated Watson's position, and Luebbers, who rode in the middle of the back seat of the car driven by Starderman. The positions of the vehicles and Watson were determined based upon measurements taken by the officers at the accident scene. Luebbers testified that the re-creation occurred at approximately the same time as the original accident, after dark when headlights were mandatory.
Luebbers stated that Starderman operated the vehicle in which he was riding at a speed of thirty-five miles per hour in the same direction in which Palm was operating her vehicle on the night in question. Luebbers testified that neither he nor Starderman could see Herron until they passed the headlights of the van and that Starderman had to stop suddenly to avoid hitting Herron. Luebbers stated that after the re-creation, both he and Starderman determined that on the evening of March 2, 1995, Palm would have been unable to see Watson on the roadway until after she passed the headlights of the van. Luebbers indicated that Palm would have had less than twenty feet available to her to observe Watson and react to his presence depending upon the speed of her vehicle.[3]
The evidence presented to the trial court indicates that none of the persons in the Palm vehicle could see Watson until the Palm vehicle passed the headlights of the Watson van parked in the roadway on the opposite side of the road. In addition, the independent reconstruction of the accident by the police officers indicates that Palm would have been unable to see Watson in the roadway until she had passed the van, as the headlights of the van were blinding. Appellants presented no evidence to contradict the testimony of Palm, Anderson, Hafner, and Luebbers that Watson was not visible in the roadway until after the Palm vehicle passed the blinding headlights of the van.
However, the evidence in the record is conflicting in terms of whether Palm was travelling at an appropriate speed at the time of the collision given the fact that the headlights of Watson's van blinded her to some extent. According to the passengers in the Palm vehicle, Palm slowed her vehicle when she first saw the headlights of the two stopped vehicles and then began to accelerate again when she realized that the vehicles were not turning. While Palm, Anderson, and Hafner all testified that Palm slowed her vehicle from approximately forty-five to fifty miles per hour to thirty to thirty-five miles per hour, Reese testified that the Palm vehicle appeared to be travelling at least fifty-five miles per hour. The evidence indicates that Palm could see past the van because she could see the Reese vehicle, but she could not see down her lane of travel where Watson was located until after she passed the headlights of Watson's van.
After carefully reviewing the record, we find that the speed of the Palm vehicle is a factor to be considered in order to resolve the issues presented in this case and that a question of fact exists as to whether Palm had a duty to slow or stop her vehicle when the headlights of the Watson van blinded her and prevented her from seeing down her lane of travel. See Kormos,131 Ohio St. at 477. In fact, Palm and both passengers in her vehicle testified that they could not see anything down their lane of travel just before the collision with Watson. Under the circumstances, a question of fact exists as to whether Palm decreased her speed enough or whether she should have stopped altogether since she was blinded, at least temporarily, by the headlights of the Watson van.
Accordingly, we find that a genuine issue of material fact exists as to whether Watson was reasonably discernible under the circumstances given the fact that Palm was admittedly travelling at least thirty-five miles per hour, was blinded by the headlights of Watson's van, and could not see down her lane of travel. See Ziegler, 67 Ohio St.3d at 12-13; Sharp,36 Ohio St.3d at 175; Smiley, 138 Ohio St. at 92; Kormos, 131 Ohio St. at 477. Appellants' sole assignment of error is sustained and the decision of the trial court is reversed and remanded for further proceedings consistent with this opinion.
KOEHLER and WALSH, JJ., concur.
[1] Clermontville-Laurel Road is a narrow two-lane roadway that runs east and west.
[2] The Palm vehicle was not used in the re-creation.
[3] Luebbers also stated that no citations were issued to any of the parties involved in the accident. Luebbers testified that pursuant to his investigation of the accident, he did not feel that Palm's driving ability was impaired by alcohol or illegal substances.